UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

SHONTAY D. JOHNSON,

        Plaintiff,

v.                                         Case No. 11-C-1177

CAROLYN W. COLVIN[1]
Acting Commissioner of Social Security,

        Defendant.

---

### DECISION AND ORDER REVERSING DECISION OF THE COMMISSIONER AND REMANDING CASE

Shontay D. Johnson appeals from the Social Security Administration's denial of her application for Supplemental Security Income disability insurance benefits (DIB) and Supplemental Security Income (SSI). Johnson's claim for benefits was denied initially and upon reconsideration. Thereafter, the Administrative Law Judge (ALJ) conducted a hearing on September 22, 2010, at which Johnson was represented by counsel. Johnson and a vocational expert (VE) testified. On December 2, 2010, the ALJ denied benefits. On October 27, 2011, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

Johnson filed this appeal on December 29, 2011, again represented by counsel. She asserts that the ALJ committed errors of law and that the decision was not supported by substantial evidence.

Under 42 U.S.C. § 405(g), "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." § 405(g). On review,

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security, replacing Michael J. Astrue. Social Security Fact Sheet, http://www.ssa.gov/pressoffice/factsheets/colvin.htm (last visited Mar. 18, 2013). Accordingly, the caption has been amended.

the court will overturn the Commissioner's final decision only if it lacks support by substantial evidence, is grounded in legal error, or is too poorly articulated to permit meaningful review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). The court views the record as a whole but does not reweigh the evidence or substitute its judgment for that of the ALJ. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). The ALJ is not required to address every piece of evidence or testimony presented, but must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Evidence favoring as well as disfavoring the claimant must be examined by the ALJ, and the ALJ's decision should reflect that examination. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). However, the court's review is confined to the rationale provided in the ALJ's decision. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)).

To obtain DIB and SSI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.

The Social Security Administration has adopted a sequential five-step process for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The ALJ determines at step one whether the claimant is currently engaged in substantial gainful activity. If not, at step two the ALJ determines whether the claimant has a severe physical

2

or mental impairment.  If so, at step three the ALJ determines whether the claimant's impairments meet or equal one of the impairments listed in the Administration's regulations, 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"), as being so severe as to preclude substantial gainful activity.  If so, the claimant is found disabled.  If not, at step four the ALJ determines the claimant's residual functional capacity ("RFC") and whether the claimant can perform her past relevant work.  If she can perform her past relevant work she is not disabled.  However, if she cannot perform past work, then at step five the ALJ determines whether the claimant has the RFC, in conjunction with age, education, and work experience, to make the adjustment to other work.  If the claimant can make the adjustment, she is found not disabled.  If she cannot make the adjustment, she is found disabled.  20 C.F.R. 404.1520; *see Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

RFC is the most the claimant can do in a work setting despite her limitations.  20 C.F.R. § 404.1545(a)(1); SSR 96-8p; *Young*, 362 F.3d at 1000-01.  The Administration must consider all of the claimant's known, medically determinable impairments when assessing RFC.  § 404.1545(a)(2), (e).  The burden of moving forward at the first four steps is on the claimant.  At step five, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of other jobs that exist in the national economy.  *See Young*, 362 F.3d at 1000.

In the present case, the ALJ determined that Johnson had the RFC "to perform light work . . . that is unskilled, involves no vibrating tools, and requires maximum total lifting and carrying of no more than ten pounds with maximum unilateral lifting and carrying with the left hand of no more than two pounds, no constant grasping or fine finger manipulation with the right hand, and no frequent grasping or fine finger manipulation with the left hand.  (Tr. at

3

13.) He then decided at step five that Johnson was not disabled because there are jobs that exist in significant numbers in the national economy that she is able to perform. (Tr. at 18.)

ANALYSIS

Johnson's records show that her predominant issue is chronic pain in her arms. (*See, e.g.,* Tr. at 508.) She has been diagnosed at various times with carpal tunnel syndrome (Tr. at 323, 328, 373, 410, 501), fibromyalgia (Tr. at 593, 596, 548, 593), possible thoracic outlet syndrome[2] (Tr. at 383, 536), and chronic pain syndrome (Tr. at 533, 548). Johnson has also had complaints of migraines and depression. (*See* Tr. at 595.) Her arm pain began around July 2007, causing her to stop work, though she appears to have attempted to return to work without success between February and May 2008. (*See* Tr. at 460-61.)

A. Credibility

In determining the credibility of a claimant's statements, an ALJ must consider the entire case record. SSR 96-7p. This includes the objective medical evidence, the individual's statements about symptoms, statements provided by treating or examining physicians, and any other relevant evidence. *Id.* "[S]ymptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." *Id.* Additionally, when assessing credibility, the ALJ must consider: the individual's daily activities; the location, duration, frequency, and intensity of pain; factors that precipitate or aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication taken; treatment other than medication that the person has received for relief of pain; any

---

[2]Thoracic outlet syndrome is a condition involving pain in the neck and shoulder, numbness and tingling of the fingers, and a weak grip. It may be caused by pressure on blood vessels or nerves as they pass through a narrow space near the shoulder and collarbone on the way to the arms. United States Library of Medicine, Thoracic Outlet Syndrome, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002406/ (last visited Mar. 17, 2013).

4

measures other than treatment the person has used to relieve pain; and any other pertinent factors. *Id.* Once the ALJ makes a credibility finding, the impact of the symptoms on the individual's ability to function are considered along with the objective medical and other evidence. *Id.*

Johnson's testimony at the hearing focused on the pain in her arms and its effect on her abilities. Johnson testified that she stopped working in 2007 when the initial thought was she had carpal tunnel syndrome. (Tr. at 66.) By about June 2008 Johnson was drinking heavily when she knew she could not take care of her children and go back to work. (Tr. at 68.) At some point she was smoking marijuana regularly; her smoking "got heavily [sic] during the pain and throughout, because [she] wasn't getting any medication," could not sleep, and was dealing with depression. (Tr. at 71-72.)

Johnson testified that her children prepare their own meals; usually her ten-year-old daughter prepares meals with Johnson looking over her and telling her how to do it. Her children clean the house, do the laundry, and take care of the dog. Johnson does none of the cleaning or laundry. (Tr. at 88.) However, she noted that she took her children grocery shopping. (Tr. at 58-59, 88.)

Johnson said she needed help from her sister or daughter to shower—with turning the water on and off and with washing. (Tr. 80-81.) According to Johnson, she does what she can until her hands cramp up, but her sister or daughter do most of the bathing. (Tr. at 81.) She uses her right hand primarily. (Tr. at 81-82.) Johnson further testified that she needs assistance putting on her bra and pulling up her clothing. (Tr. at 82.)

Johnson's attorney asked whether some days were better and some other days were very, very bad. Johnson replied "Yeah, when I do nothing. If I do nothing, I have no pain.

5

Anything I do causes pain. I can't do anything without pain." (Tr. at 77.) After the ALJ commented regarding this testimony, she adjusted her statement: "if I do nothing, it's not extreme. . . . because I have continuing pain. The pain does not stop, it's persistent. In my left arm it [is] very persistent. It hasn't stopped. It's been consistent for – since '07." (Tr. at 78.) Johnson added that sitting at the hearing on a scale of zero to ten her pain in her left arm was an eight and the pain in her right arm was a six. (Tr. at 78.) She further testified that the pain in her left arm is always at least a six but on a bad day is a ten; similarly, on a bad day the pain in her right arm is a ten. (Tr. at 79.) When asked how many bad days she had, Johnson said "every day is a bad day," then clarified that she had days of pain at level ten about four times a week. (Tr. at 79-80.)

According to Johnson, she also has "excruciating" lower back pain. (Tr. at 83.) Sometimes she cannot walk about two blocks from her house to the store because of the pain. (Tr. at 83.) However, Johnson did go to the store two days before the hearing, though she "barely made it back" and required the help of her children. (Tr. at 83.) Usually, she sends her kids to the store; about once every three weeks she walks if she has to. (Tr. at 88.) Johnson said she also had pain in her legs and neck, and that her feet swell. (Tr. at 84.)

Johnson testified that she had "migraines at least about four to five times out of the month. And when I have them they take me down for at least two weeks. I mean, they don't stop." (Tr. 84.) When questioned by the ALJ as to how that could be because there are not eight to ten weeks in a month, Johnson responded: "Well, I'm over-calculating." (Tr. at 84.) She later stated: "[W]ith the migraines I'm not going to say like I've been taken up for the whole month. I'm saying I, I really don't know how to describe it, but I have migraines a lot."

6

(Tr. at 87.) According to Johnson, she must go somewhere quiet and dark when she has migraines. (Tr. at 85.) When that occurs her son and daughter get themselves and the other children up and off to school. (Tr. at 87.)

Johnson testified that medication did not help with her pain. (Tr. at 98.) She then testified that Advil helps with the pain in her back and her migraines, but not her arm pain. (Tr. at 99.) Johnson stated that when she gets very depressed she wishes she would not wake up so her children would not "have to keep going through that." (Tr. at 100.) Johnson added that Cymbalta and Amitriptyline help with her depression. (Tr. at 101.) She noted that cold weather affected her worse than other weather and she only goes out for appointments and grocery shopping. (Tr. at 101.)

Continuing, Johnson mentioned that she takes online classes in criminal justice. (Tr. at 91.) She sits and listens to lectures about three times and has one or two assignments due throughout a week. (Tr. at 92.) When asked about how much time she spent online, Johnson testified: "for the homework it takes me at least an hour. I mean it, it really does – it, it's not hard work, but I have to type it in with my right hand, and then I have to tell the kids to come in and help me type some, you know . . . ." (Tr. at 92.) She confirmed that she spent up to about three hours a week doing her homework. (Tr. at 93.) For her reading and lectures she was online about another three hours per week, for a total of six hours per week for the class. (Tr. at 94-95.) At the time of the hearing she had been taking the class for six weeks. (Tr. at 95.)

In his opinion, the ALJ noted Johnson's testimony that

her physical pain causes her to require assistance with bathing and dressing, and that her children perform all of the housekeeping chores due to her inability. She testified that her migraine headaches bother her four or five times per month, and that she needs to retreat to recover in a room by herself.

7

> Regarding her depression, the claimant testified that her inability to engage in activities has caused her to experience depression, and that she has responded by engaging in heavy drinking and the use of marijuana. However, despite the claimant's alleged impairments, she is still able to shop, use a computer and take her daughter to school (Ex. 5E/2.) She also held a position as a banquet server until May of 2008 where she testified she set tables, delivered meals to customers and removed finished plates.

(Tr. at 14.) In the section of his opinion setting forth his RFC finding, the ALJ assessed Johnson's credibility as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity.

(*Id.*)

With one exception ("could" instead of "would"), this language is identical to that rejected in *Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012). The Seventh Circuit criticized this language for its suggestion that the ALJ worked backwards from determining RFC to determining credibility, which is impermissible. *Id.* at 645. Moreover, this boilerplate language is in tension with SSR 96-7p, which states that an individual's statements about pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence. *Id.* at 646. Unless other discussion by the ALJ indicates that credibility was assessed properly, the case must be remanded based on this unacceptable language.

The ALJ in the present case did not stop with the boilerplate and addressed Johnson's credibility for two more pages, which might have saved his opinion from reversal. Some of the ALJ's discussion is supported by substantial evidence and could be upheld, such as his finding that Johnson is

8

prone to exaggeration as demonstrated by rating her pain a "25" on a "10" scale and then adjusting it to an "8,"[3] and by stating she has four to five migraine headaches per week that cause her to not function for two weeks, but then later stating she would be out for only eight days per month. Additionally, there are several inconsistencies with her testimony regarding her alcohol and substance use. Overall, the claimant's subjective allegations are generally given less weight due to the many inconsistencies described above.

(Tr. at 16.) The court agrees that Johnson's testimony contains several instances of exaggeration, especially regarding the frequency and duration of her migraines and how every day is a "bad day." Evidence from the report to a physician that her pain was a "25" similarly supports a finding of exaggeration.

Unfortunately, other portions of the ALJ's credibility analysis require reversal, especially when combined with the *Bjornson* language. First, the ALJ labeled as "inconsistencies" facts that were not actually inconsistent:

> There are also several inconsistencies regarding the claimant's alleged statements regarding her pain. During one examination she stated her pain was a "25" on a "10" scale, but later at the same examination revised her level to an "8" (Ex. 25F/6.) The claimant was also seen on two separate occasions for a functional capacity evaluation. During her first examination in November of 2009, she declined to participate citing extreme bilateral hand and forearm pain as preventing her participation (Ex. 26F/2.) On a second attempt in March of 2010, she began the examination but stopped after an hour due to pain in both upper extremities (Ex. 26F/6.) Thus, her evaluators concluded that there was no valid or reliable representation of the claimant's true work abilities (Ex. 26F/7.)

(Tr. at 15.) That Johnson could not complete a functional capacity evaluation is actually *consistent* with her reports of pain. And her revision from a "25" to an "8" may reflect an exaggeration, but not an inconsistency, as an "8" on a scale of "10" is on the high end.

Second, the ALJ misinterpreted the record as to Johnson's abilities regarding the online course when he wrote: "Additionally, the claimant testified that she takes an online

---

[3]This statement came from the medical records from an examination. (Tr. at 596.)

9

course requiring her to use a computer for about six hours per week. Her computer use, which presumably includes a fair amount of typing, is inconsistent with her inability to write to fill in reports and undergo a functional capacity evaluation . . . ." (Tr. at 15.) There is no basis in the record for the ALJ's presumption that Johnson's class required her to type "a fair amount." Indeed, the testimony pointed to little typing. Johnson's testimony indicated that three hours of course activity per week were spent watching or reading, not typing, and that for the three hours per week that involved typing she used her right hand only or had her children type for her.

Third, the ALJ's credibility discussion relies heavily on the lack of medical support for Johnson's complaints of pain, although SSR 96-7p states that lack of objective medical evidence is not a sufficient basis for a credibility finding. Here, the ALJ observes that Johnson's "impairments are only loosely demonstrated by the objective medical evidence" and described various test results that were normal, concluding that "the objective medical examinations and tests do not support the severity alleged by the claimant." (Tr. at 14, 15.) Two paragraphs later he again references the "absence of any objective medical evidence demonstrating aggravated symptoms arising to the level of severity alleged by the claimant." (Tr. at 15.) A paragraph after that he notes respecting migraines that, "the claimant does not have a constant and significant medical history of these impairments." (Tr. at 15.) Regarding depression, the ALJ wrote that he "consider[ed] the claimant's lack of formal treatment, instead opting to self-medicate with alcohol and drugs, to suggest that her alleged mental impairment symptoms are not as great as alleged." (Tr. at 16.) In light of these references to the lack of objective medical evidence or treatment, the ALJ needed to

10

describe better the other factors required by SSR 96-7p, such as Johnson's daily activities, the intensity of her pain, factors that aggravate the symptoms, etc.

And fourth, the perceived inconsistencies the ALJ saw between the medical records and Johnson's testimony are not supported by substantial medical evidence. For instance, the ALJ discounted Johnson's testimony about pain in her legs from swelling because "an X-ray image showed normal bone mineralization in her right knee and no acute fracture or subluxation." (Tr. at 15.) This court lacks medical expertise and cannot say whether bone mineralization has anything to do with leg swelling and pain or whether there may be other causes for leg swelling. It wonders how the ALJ drew this conclusion, inasmuch as he failed to cite to evidence in the record leading to his conclusion. Similarly, the ALJ states that "although her physicians described her as having thoracic outlet syndrome, only mild degenerative changes were found in her cervical spine without any other evidence of disc protrusion or herniation, and her spinal cord signal was evaluated as normal." (Tr. at 14.) Again, the ALJ needed to point to evidence in the record indicating that these test results have anything to do with the syndrome. As an ALJ is not a doctor, he should avoid commenting on the meanings of tests when there is no supporting expert testimony supporting that meaning. *See Liskowitz v. Astrue*, 559 F.3d 736, 741 (7th Cir. 2009) ("[A]n ALJ cannot play the role of doctor and interpret medical evidence.") (quoting *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (alteration in original)).

For all of these reasons, the decision must be reversed as to credibility.

B.   Physician Opinions

Next, Johnson challenges the ALJ's treatment of the medical opinions of Drs. Mohammad Q. Khan, Jack Spear, and Phillip Ruppert.

11

Generally, the Administration gives more weight to the medical opinion of a source who examined the claimant than the opinion of a source who did not. 20 C.F.R. § 404.1527(d)(1). Further, because of the unique perspective of and longitudinal picture from a treating physician, his or her opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *accord* SSR 96-2p; *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). "Controlling weight" means that the opinion is adopted. SSR 96-2p. A treating physician's opinion may have several points; some may be given controlling weight while others may not. *Id.* When evidence in opposition to the presumption is introduced, the rule disappears and the treating physician's opinion is just one piece of evidence the ALJ must consider. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006).

An ALJ's finding that a treating physician's opinion is not entitled to controlling weight "does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p. In determining the weight to give a non-controlling treating physician's opinion, the ALJ must consider the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the physician's evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialty of the physician, and any other relevant factors. 20 C.F.R. § 404.1527(d)(2)-(6).

The ALJ must always give good reasons for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the

12

treating source's medical opinion and the reasons for that weight." SSR 96-2p. An ALJ can reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel*, 345 F.3d at 470.

The weight given to nonexamining sources "will depend on the degree to which they provide supporting explanations for their opinions" and "the degree to which these opinions consider all of the pertinent evidence." 20 C.F.R. § 404.1527(d)(3).

1.  Dr. Khan

Dr. Khan is one of Johnson's treating physicians. He treated Johnson from July 2007 to August 2010. In May 2008, Dr. Khan diagnosed Johnson with carpal tunnel syndrome and limited Johnson to lifting, pushing or pulling no more than five pounds. (Tr. at 323, 387.) Subsequently, on August 4, 2010, he completed a "Medical Assessment Form" in which he diagnosed Johnson with fibromyalgia and chronic pain (Tr. at 551) and stated that during an average workday Johnson would need to take eleven or more breaks of twenty minutes each; never lift any weight, even less than ten pounds; was unable at all to use her hands for grasping, turning, or twisting objects, and also was unable to use her fingers for manipulating, or her arms for reaching (Tr. at 553-54). The ALJ's RFC finding conflicts with Dr. Khan's assessment in that the RFC finding includes no limitation for breaks, indicated Johnson could lift up to two pounds with her left hand and up to ten pounds total, and indicated that Johnson could grasp and manipulate with her fingers so long as it was not constant for the right hand or frequent for the left. (Tr. at 13.)

The ALJ stated that he "generally used" Khan's findings in assessing RFC and in some ways was more generous than Khan (and two other doctors). He wrote: "Instead, the undersigned has taken the findings of these physicians but limited the claimant even more

13

by restricting her to a maximum lifting and carrying with the left hand of no more than two pounds and has included restrictions on fine finger manipulation and grasping of both hands." (Tr. at 15.) Later, the ALJ described how he gave "some weight" to Khan, then continued:

> Initially, Dr. Khan opined that the claimant should lift no more than five pounds . . . . However, Dr. Khan later found that the claimant cannot use either hand at all to reach or grasp, and that she can never lift or carry less than ten pounds (Ex. 23F/3, 4.) These findings are inconsistent with the longitudinal medical record, including Dr. Khan's earlier findings, and are not supported by a substantial change in the claimant's medical condition from the time of Dr. Khan's earlier findings. Thus, Dr. Khan is only afforded weight for his earlier findings, which are more consistent with the medical evidence as a whole.

(Tr. at 17.)

In rejecting as controlling Khan's later opinion that Johnson could not reach or grasp and that she could not lift anything with her arms, the ALJ failed to discuss how it was not well-supported by medically acceptable clinical and laboratory diagnostic techniques and specifically how it was inconsistent with other substantial evidence in the record. Instead, the ALJ made only a conclusory remark that the findings were inconsistent with the longitudinal medical record and Khan's earlier opinion, yet saw in the record no substantial change in Johnson's medical condition that warranted the change in restrictions. However, the earlier opinion was soon after Johnson started treatment, and Khan's diagnosis of carpal tunnel syndrome. Three years later, when Johnson's symptoms and pain had not abated, Khan diagnosed her with fibromyalgia and chronic pain. Nevertheless, even the ALJ found the evidence warranted a weight restriction as to Johnson's left arm lower (two-pounds maximum) than Khan's earlier finding (five pounds total). Further, Khan's prior finding of a five-pound limitation addressed only lifting and carrying. The ALJ points to no contrary

14

finding by Khan regarding grasping, manipulation, reaching, and need for Johnson to take breaks.

In addition, the ALJ did not discuss the factors of SSR 96-2p and 20 C.F.R. § 404.1527(d) as was required once he found the treating physician's opinion noncontrolling. Although he discussed the consistency of the physician's opinion with other medical evidence in the record, he did not discuss the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the physician's evidence supporting the opinion, or the specialty of the physician.

Thus, the case must be remanded for reconsideration of Khan's medical assessment form and Khan's other medical records.

2.  Dr. Spear

Dr. Spear performed a psychiatric review. In a "Mental Residual Functional Capacity Assessment," Dr. Spear found that Johnson was moderately limited in her ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual, complete a workday without interruption from psychologically based symptoms, perform at a consistent pace without rest periods, and respond appropriately to changes in the work setting. (Tr. at 481-83.) Spear opined that Johnson was able to meet the basic demands of unskilled work. (Tr. at 483.) In his psychiatric review Spear stated that Johnson had moderate limitation in maintaining concentration, persistence, or pace. (Tr. at 795.)

The ALJ said he was according "significant weight" to Spear and adopted the finding of moderate difficulties regarding concentration, persistence, and pace. (Tr. at 16, 12.) However, those limitations do not appear in the RFC finding; a restriction to unskilled work

15

does not necessarily account for moderate limitations on concentration, persistence, and pace, *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). Moreover, although the ALJ's RFC finding accords with Spear's opinion of unskilled work, the ALJ failed to discuss the specifics of Spear's findings regarding moderate limitations as to maintaining regular attendance, punctuality, completion of a workday without interruption, and response to changes in the work setting and how they factored into the ALJ's RFC analysis. On remand, the ALJ needs to build a better bridge between the medical evidence and the RFC finding, as the court cannot tell whether these other opinions by Spear were accepted by the ALJ and how they affected the ALJ's decision.

3.   Dr. Ruppert

Dr. Ruppert was a consultative examiner who conducted an in-person mental status evaluation of Johnson on January 20, 2009. Ruppert's opinion on Johnson's capacity for work function was as follows:

> Shontay continues to demonstrate the capacity to understand, remember, and carryout [sic] simple job instructions, although her chronic pain can make completing tasks somewhat difficult. Her capacity to maintain attention, concentration, and pace would be between fair and good given her performance on formal Mental Status Examination items. Her capacity to relate appropriately to fellow coworkers and supervisors would be good. Her capacity to withstand stress within the workplace setting would be fair.

(Tr. at 465.)

In his decision, the ALJ said he was giving "some weight" to Ruppert's findings. However the ALJ then noted only the statements from Ruppert that Johnson demonstrates the capacity to understand, remember and follow simple job instructions, concluding that this opinion was met by limiting Johnson to unskilled work. The ALJ failed to acknowledge or explain whether or how he considered Ruppert's opinion that Johnson had chronic pain that

16

would make completing tasks somewhat difficult and her capacity to withstand workplace stress was fair. (Tr. at 465.)

4.   Drs. Baumblatt and Foster

Johnson contends that the ALJ similarly failed to discuss all of the findings of Drs. Baumblatt and Foster. Because this case is being remanded as to the assessment of other physicians' opinions, the ALJ should reassess the opinions of all of the doctors.

C.   RFC and Hypotheticals Posed to the VE

Johnson submits that the ALJ found that she had the severe mental impairment of "depression NOS" but failed to address her limitations in concentration, persistence and pace other than concluding that she could do only unskilled work. Further, Johnson contends that the hypotheticals posed to the VE were faulty.

Because of the above errors, on remand the ALJ must reassess RFC, which may alter the limitations that are found and the hypotheticals posed to a VE. In addition, Johnson is correct that the ALJ adopted Spear's opinion of moderate difficulties regarding concentration, persistence, and pace, but did not include those limitations in his hypothetical to the VE. (*See* Tr. at 108 (limiting Johnson to light work, no constant grasping or finger manipulation with the right hand, no frequent grasping or finger manipulation with the left hand, ten pounds lifting, with five pounds on the left hand, and no vibrating tools), 111-14 (adjusting hypothetical but not adding limitations on concentration, persistence, and pace).) "[L]imiting a hypothetical to simple, repetitive work does not necessarily address deficiencies of concentration, persistence and pace." *O'Connor-Spinner*, 627 F.3d at 620. "The ability to stick with a given task over a sustained period is not the same as the ability to learn how

17

to do tasks of a given complexity." *Id.* On remand, if the ALJ finds that concentration, persistence, and pace are limited, the RFC and hypotheticals should reflect that finding.

In addition, the Seventh Circuit instructs ALJs to acknowledge the differences between the activities of daily living and the activities of a full-time job:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Bjornson*, 671 F.3d at 647. Here, the ALJ did not address sufficiently how Johnson's non-daily activities of walking to the grocery store every three weeks, typing on the computer with one hand for a few hours a week, and taking her daughter to school translated into being able to hold down a full-time job. Further, he did not address Johnson's inability to dress herself, cook or clean.

## CONCLUSION

For these reasons,

IT IS ORDERED that the Commissioner's decision is reversed and this case is remanded under sentence four of 42 U.S.C. § 405(g).

Dated at Milwaukee, Wisconsin, this 21st day of March, 2013.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE

18